UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
ANTHONY L. GARITTA,

                Plaintiff,             MEMORANDUM & ORDER
                                          20-CV-1358 (JS)

    -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------X
APPEARANCES
For Plaintiff:       Howard d. Olinsky Esq.
                  Olinsky Law Group
                  250 South Clinton Street, Suite 210
                  Syracuse, New York  13202

For Defendant:       Kristin Everhart, Esq., Special A.U.S.A.
                  United States Attorney's Office
                  Eastern District of New York
                  271 Cadman Plaza East, 7th Floor
                  Brooklyn, New York  11201


SEYBERT, District Judge:

        Plaintiff Anthony L. Garitta ("Plaintiff") brings this

action pursuant to Section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), challenging the denial of his

application for Social Security Disability Insurance Benefits by

the Commissioner of Social Security (the "Commissioner").  (See

Compl., ECF No. 1.)  Pending before the Court are the parties'

cross-motions for judgment on the pleadings.  (See Pl. Motion, ECF

No. 11; Pl. Support Memo, ECF No. 12; Comm'r Cross-Motion, ECF No.

14; Comm'r Support Memo, ECF No. 14-1; Pl. Reply, ECF No. 16; see

also Admin. Tr., ECF No. 9.[1]) For the following reasons, Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED.

BACKGROUND

I.   Procedural History

On February 11, 2016, Plaintiff completed an application for disability insurance benefits alleging disability as of February 10, 2014, due to back and neck radiculopathy and migraine headaches. (R. 11.) After Plaintiff's claim was denied, on August 17, 2016, he requested a hearing before an Administrative Law Judge ("ALJ"). (Id.)  On November 8, 2018, Plaintiff, accompanied by counsel, appeared at a hearing before ALJ Patrick Kilgannon.  Dr. Yaakov Taitz, a vocational expert ("VE"), also testified via telephone at the hearing. (Id.)

In a decision dated December 5, 2018, the ALJ found Plaintiff was not disabled. (Id.)  On January 9, 2020, the Social Security Administration's Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the Commissioner's final decision. (R. 1.)

Plaintiff initiated this action on March 13, 2020. (See Compl.)  On December 8, 2020, the Plaintiff moved for judgment on the pleadings.  The Commissioner cross-moved for judgment on the

---

[1]  Hereafter, the Court shall cite to the Administrative Transcript as "R" and provide the relevant Bates Stamp number(s).

pleadings on February 8, 2021.  Plaintiff filed a reply on March 1, 2021.  The Cross-Motions are ripe for decision.

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to his medical records and the VE's testimony.

A.  Testimonial Evidence and Employment History

Plaintiff has a high school education. (R. 42.)  From 1993 to 2014, he worked for the New York City Police Department, with 12 of those years working as a detective. (R. 44.)  In February 2014, Plaintiff stopped work as a detective; he retired in August 2014. (R. 43-44.)  In December 2014, Plaintiff worked as a part-time bus driver, which he did until March 2015 when he stopped due to his impairments. (R. 46.)  At the time of his disability hearing on November 8, 2018, Plaintiff was 44 years old. (R. 41.)

At the November 2018 hearing, Plaintiff testified, among other things: he stopped working as a detective due to constant back pain (R. 46); he stopped working as a bus driver due to pain while driving and getting ready in the morning (R. 47); and, he receives shots and physical therapy for pain management, but they have not improved his condition (R. 46).  Further, in addition to constant back pain, Plaintiff also testified he suffered from aura migraines two to three times per week. (R. 49.)  He explained that,

while medications helped his migraines temporarily, he no longer receives relief from them. (R. 51.)

Plaintiff stated he can: sit for half-an-hour a day; stand for ten to fifteen minutes at a time; and, walk approximately a block. (R. 52-53.)  He also testified he could lift about a couple pounds "if he had to" and put on his jacket. (R. 53.) Plaintiff further asserted: his family members help with cooking and shopping; he has difficulty driving; and, he takes three to four naps per day due to lack of sleep at night. (R. 56-58.)

B.   Medical Evidence

On April 5, 2012, following a work-related motor vehicle accident in which he was a front-seat passenger in a police van that stalled and was rear-ended, Plaintiff went to the emergency room. (R. 267, 282.)  There, he reported neck and arm pain, but x-rays of his spine and arm did not show a fracture or dislocation. (R. 267, 273.)  Plaintiff's chest scan was also unremarkable. (R. 272.)  The hospital advised Plaintiff to follow up with his primary care physician and take ibuprofen as needed. (R. 268.)

1.   Maxim Tyorkin

On May 16, 2012, Plaintiff saw orthopedist Maxim Tyorkin, MD, for lower back pain. (R. 276.)  At that time, Plaintiff was unable to heel- or toe-walk. (Id.)  His range of motion was normal, but there was pain with range of motion in the lower spine, tenderness, and muscle spasm. (Id.)  An MRI of the

lumbar spine revealed right paracentral disk protrusion L3-L4 with moderate thecal sac compression, central disk protrusion L4-L5 with moderate thecal sac compression, and small central disk protrusion L5-S1. (R. 278.)  Dr. Tyorkin recommended activity modification, physical therapy, anti-inflammatories, pain management, and follow-ups as needed. (Id.)

  2.  Jonathan Kuo

  Plaintiff began treatment with Jonathan Kuo, MD. on August 13, 2012. (R. 282.)  At that time, Plaintiff had pain at the bottom of his spine, in his right leg, and in the lumbar region. (Id.)  He rated his pain level as an eight-out-of-ten. (Id.)  Dr. Kuo recommended a series of lumbar epidural steroid injections and ordered a cervical spine MRI. (R. 283).  On December 3, 2012, Plaintiff reported: "a great deal of relief" for several days after the injection; a pain level of seven-out-of-ten; and, his pain was "slowly coming back to baseline." (R. 290.)  At a December 11, 2012 appointment, Dr. Kuo noted Plaintiff experienced a 40-percent improvement after one lumbar epidural steroid injection. (R. 293.)  Dr. Kuo also noted Plaintiff: was taking muscle relaxant and anti-inflammatory for pain; was not attending physical therapy anymore, since he was waiting for insurance authorization; and, worked full-time. (Id.)

  At a December 26, 2012 appointment, Dr. Kuo noted Plaintiff's 70-percent improvement after two lumbar epidural

steroid injections. (R. 296.)  While Plaintiff stated his pain was worse with sitting for long periods of time, he rated his pain level as five-out-of-ten. (Id.)  Plaintiff also reported Advil, Mobic, and Flexeril were helping and stabilizing his pain. Finally, Dr. Kuo reviewed Plaintiff's C-spine MRI, which revealed degenerative changes. (Id.)

### 3.  Martin Camins

On January 10, 2013, Plaintiff saw neurosurgeon Martin B. Camins, MD.  The Doctor noted Plaintiff had an unsteady gait while heel walking, but could walk on the toes of both feet. (R. 301.)  Dr. Camins requested a CT scan to complement Plaintiff's previous MRI scan. (R. 302.)  After reviewing Plaintiff's imaging, Dr. Camins recommended Plaintiff for surgery based upon Plaintiff's "significant disc herniations" at multiple levels. (Id.)

### 4.  Jamie Santore-Arrigo

On February 25, 2013, Plaintiff saw Jamie Santore-Arrigo, PA, the physician assistant for orthopaedic spine surgeon Jeffrey M. Spivak, MD, for back and leg pain, and to whom he reported an eight-out-of-ten pain level. (R. 304.)  PA Santore-Arrigo noted Plaintiff stopped taking prescribed Flexril and Mobic due to gastroesophageal reflux disease ("GERD"), which was significant (R. 304-305.)  At that time, Plaintiff's gait was normal, and he was able to heel- and toe-walk without difficulty.

(R. 305.)  The PA discussed nonoperative treatment strategies with Plaintiff; she also explained Plaintiff was a candidate for a right-sided microdiscectomy at L3-L4 if a new MRI showed findings similar to the one she reviewed. (R. 305.)  Because he had multilevel degenerative disc disease, and due to his great amount of pain, the PA informed Plaintiff that microsurgery to remove the herniations was unlikely to help. (R. 306.)  Plaintiff chose to proceed with an updated lumbar spine MRI and nonoperative treatment options. (Id.)

On May 10, 2013, Plaintiff underwent a block procedure on L4-5 facet joints. (R. 308.)  After the procedure, Plaintiff noted significant relief. (R. 309.)

### 5.  New York Orthopaedic Spinal Associates

On November 24, 2014, Plaintiff began treatment at New York Orthopaedic Spinal Associates for his low back pain. (R. 418.) At that time, Plaintiff had recently retired from the police force and was training as a school bus driver. (Id.)  Dr. Ira Chernoff noted Plaintiff had "a lot of conservative treatment," including four sets of physical therapy for six weeks, three epidural steroid injections, and three facet shots. (R. 419, 418.)  Plaintiff was able to heel- and toe-walk, and his lumbar flexion was 80-degrees. (R. 418.)  Plaintiff's back pain increased with extension at 15-degrees. (Id.)  Dr. Chernoff suggested Plaintiff could "do additional physical therapy", "do epidurals", or "use a lumbar

corset". (R. 419.)  Another offered option was surgery, including a discectomy and fusion surgery. (Id.)  Dr. Chernoff noted Plaintiff was able to work. (Id.)  On January 19, 2015, Plaintiff elected to continue conservative treatment for his back, i.e., physical therapy, instead of surgery. (R. 421.)

On March 16, 2015, Plaintiff returned for a follow-up; at that time, he complained of exacerbated lower back pain from putting on his shoes. (R. 422.)  Dr. Chernoff gave Plaintiff an injection of Lidocaine, Marcaine, and Depo-Medrol, as well as prescribed a non-steroidal anti-inflammatory and a muscle relaxer. (R. 423.)  A subsequent March 31, 2015 cervical MRI revealed Plaintiff had a left foraminal disc herniation at C3-4 with mild compression of the left C4 nerve root and small disc herniations from C4-5 through C6-8 without spinal cord or nerve root compression. (R. 313.)  Dr. Chernoff noted Plaintiff had mild degenerative disc disease throughout his cervical spine without progression from prior studies. (R. 313.)

On April 3, 2015, Plaintiff attended a follow-up appointment, at which he reported the March 16 injection helped. (R. 424.)  Dr. Chernoff and Nurse Practitioner ("NP") McGrath reviewed the MRI, which revealed small disc herniations of C4-5 through C6-7 without any spinal cord or nerve root compression. (Id.)  Dr. Chernoff sent Plaintiff to a neurologist to determine a possible cause of Plaintiff's hyperreflexia; he planned to see

Plaintiff again after his appointment with the neurologist. (R. 425.)

On January 29, 2016, Plaintiff saw Dr. Chernoff complaining of increased back pain. (R. 426.) Plaintiff's Lumbar spine x-rays showed multilevel degenerative changes with minimal anterior osterophytes at L3-L4, L4-L5, and L5-S1. (R. 427.) Cervical spine x-rays showed multilevel degenerative changes without any spondylolisthesis or fracture noted. (Id.) Morgan Smyth, PA-C,[2] gave Plaintiff a cluneal nerve injection, and instructed him to begin physical therapy. (R. 428.)

On March 7, 2016, Plaintiff reported physical therapy had "been helping a lot," but that he was still experiencing pain. (R. 429.) PA-C Smyth noted Plaintiff wanted to continue conservative treatment; she also recommended a trigger point injection. (R. 430.) Plaintiff was prescribed Mobic and Tramadol

---

[2] "A physician assistant (PA) is a licensed medical professional who holds an advanced degree and can provide direct patient care." Mayo Clinic College of Medicine and Science, Academics, Explore Healthcare Careers: Physician Assistant, https://college.mayo.edu/academics/explore-health-care-careers/careers-a-z/physician-assistant/#:~:text=After%20successful%20completion%20of%20a,Certified%20(PA%2DC) (last visited July 30, 2024). "PA-C" indicates one is a Certified Physician Assistant, i.e., a PA who has passed the Physician Assistant National Certifying Examination administered by the National Commission on Certification of Physician Assistants. See id.; see also https://www.nccpa.net ("The National Commission on Certification of Physician Assistants (NCCPA) is the only certifying organization for Pas in the United States.").

for breakthrough pain. (Id.)   At a March 21, 2016 follow-up appointment, Dr. Chernoff recommended Plaintiff continue physical therapy. (R. 431.)   The Doctor also reported the findings from an updated March 10, 2016 MRI showed: moderate disc disease from L3-4 through L5-S1; central and right-sided disc herniation with mild central stenosis at L3-4; right-sided disc herniation that extends into the lateral recess, but did not appear to compress the right L5 nerve root at L4-5; and, central disc herniation with mild mass effect on the left S1 nerve note. (R. 434.)

Plaintiff had two further followed-up appointments: one on September 19, 2016; and another on December 12, 2016. (R. 496-98.)   NP McGrath noted that, because Plaintiff was given a prescription for physical therapy which his insurance did not cover, he was doing at-home exercises for his neck and lower back. (R. 496.)   Plaintiff was ambulatory and could heel- and toe-walk at both follow-up appointments (R. 496, 498.)   Additionally, Plaintiff's lumbar flexion was 90-degrees, hyperextension was 20-degrees past neutral, and cervical flexion was chin-to-chest at both follow-ups. (R. 496, 498.)   At the December 2016 appointment, NP McGrath renewed Plaintiff's Tramadol and Mobic prescriptions. (R. 499.)

On March 10, 2017, Plaintiff noticed increasing hip pain without a related injury. (R. 500.)   He had full strength in the lower extremities bilaterally and full range of motion in his hips,

but suffered tenderness over the right iliac crest. (Id.)  An x-ray showed a possible bone cyst at the anterior and superior iliac crest on the right and some mild arthritic changes. (Id.)  PA-C Smyth ordered a CAT scan and gave Plaintiff a prescription for physical therapy. (R. 501.)  On April 24, 2017, PA-C Smyth noted Plaintiff: had not started physical therapy; was "essentially status quo" since his last visit: and, was still experiencing tenderness over the right iliac crest. (R. 502-503.)  Pelvis CAT scans demonstrated osteophyte formation of anterior and superior iliac crest on the right. (R. 503.)  Plaintiff was advised to take glucosamine and begin physical therapy. (Id.)  At his subsequent June 26, 2017 follow-up appointment, Plaintiff reporting he was "doing better" and had not started the recommended glucosamine or physical therapy. (R. 504-505 (further reporting Plaintiff was "really not doing any treatment").)

More than a year later, on September 7, 2018, Plaintiff returned to New York Orthopaedic Spinal Associates, reporting his pain had "been getting a little bit worse." (R. 506.)  Plaintiff complained of: lower back pain mostly on the right side; pain going down the right leg; left leg discomfort radiating into the left groin; and, neck pain. (Id.)  Further, coughing and sneezing increased Plaintiff's pain, and he would wake from sleep due to the pain. (R. 507.)  Plaintiff reported "walking [was] okay," but sitting [was] "the worst." (Id.)  He was able to heel- and

toe-walk, but had difficulty walking in a straight line. (Id.)
Pelvis x-rays showed arthritic changes of the hips bilaterally.
(Id.)  Cervical spine x-rays showed anterior osteophytes at C4-5
and C5-C6 with decreased disc height spaces at these levels. (Id.)
Lumbar spine x-rays showed multilevel degenerative disc disease.
(Id.)  PA-C Smyth's impressions after Plaintiff's exam included:
hyperreflexia with clonus; positive Hoffman's sign; difficulty
walking a straight line; lower back pain with right cluneal nerve
neuroma with multilevel lumbar spondylosis; and, left hip
arthritis with groin pain. (R. 507.)  Therefore, in addition to
ordering "an MRI of the cervical spine to rule out any kind of
cord compression," the PA-C started Plaintiff on lumbar spine
physical therapy and renewed his prescriptions for Tramadol and
Mobic. (R. 508.)

        At his September 21, 2018 follow-up appointment,
Plaintiff reported physical therapy was helping his symptoms.
(R. 509.)  Plaintiff was able to heel- and toe-walk, as well as be
able to perform "pretty well with" walking in a straight line.
(Id.)  Plaintiff was hyperreflexic in the lower extremities and
continued to show positive Hoffman's sign bilaterally. (Id.)
Review of Plaintiff's previously ordered cervical spine MRI showed
mild multilevel degenerative changes. (Id.)  NP McGrath advised
Plaintiff to continue physical therapy and stated the cervical
spine MRI "look[ed] good." (R. 510.)

6. <u>Bruce Mayerson</u>

On April 29, 2015, Plaintiff saw neurologist Bruce Mayerson, MD, for headaches. (R. 327.)  Dr. Mayerson diagnosed Plaintiff with "common migraine" and ordered a repeat of Plaintiff's previous MRIs. (<u>Id.</u>)  Dr. Mayerson prescribed Topamax for daily use and Treximet as needed. (<u>Id.</u>)  Dr. Mayerson also discussed smoking cessation with Plaintiff. (R. 336.)  At a June 29, 2015 follow-up appointment, Plaintiff reported continued headaches. (R. 347.)  Dr. Mayerson advised Plaintiff to continue using Topamax; he noted that, because the co-pay was too expensive, Plaintiff never tried Treximet, so he prescribed Imitrex instead. (<u>Id.</u>)  At Plaintiff's next appointment on September 28, 2015, Plaintiff had not yet needed Imitrex and remained on Topamax. (R. 359.)

At a February 16, 2016 appointment, Dr. Mayerson noted both that Plaintiff was off Topamax and had significant light sensitivity. (R. 381.)  The Doctor had Plaintiff restart Topamax. (R. 385.)  Three months later, on May 17, 2016, Plaintiff's headaches stabilized. (R. 396.)  Dr. Mayerson noted Plaintiff had not needed Imitrex since his last visit. (<u>Id.</u>)  Plaintiff reported headache relief with Advil and still occasionally seeing flashing light, but such instances had decreased significantly. (<u>Id.</u>)  Dr. Mayerson advised Plaintiff to continue Topamax, and to use Advil and/or Imitrex as needed. (R. 400.)

7.  <u>Kanista Basnayake</u>

On July 18, 2016, Plaintiff saw Kanista Basnayake, MD, for an internal medical examination. (R. 443.)  The Doctor noted Plaintiff's chief complaint was migraine headaches, which he said occur five times per week. (<u>Id.</u>)  He also recorded Plaintiff reporting constant back and neck pain, and further explaining his neck pain worsens with neck movement but improves with pain medication. (<u>Id.</u>)  Dr. Basnayake reviewed Plaintiff's previous MRIs. (<u>Id.</u>)  He also noted Plaintiff: was unable to do cooking, cleaning, laundry, and shopping (R. 444); showered four days a week and dressed himself seven days a week; had a normal gait; and, he heel- and toe-walked without difficulty (R. 445). Plaintiff's cervical spine showed full flexion with 15-degree extension, rotation 40-degrees bilaterally, and lateral flexion 15-degrees bilaterally. (<u>Id.</u>)  Examination of his lumbar spine showed 60-degree flexion, 50-degree extension, lateral flexion 15-degrees bilaterally, and lateral rotation 15-degree bilaterally. (<u>Id.</u>)  Dr. Basnayake diagnosed Plaintiff with high blood pressure, migraine headaches, neck pain, and back pain. (R. 446.)  Dr. Basnayake opined that Plaintiff should avoid driving and operating machinery. (<u>Id.</u>)  The Doctor also stated Plaintiff had mild to moderate limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, and kneeling due to

neck and back pain. (Id.)   He described Plaintiff's prognosis as "[f]air".   (Id.)

        8.   Donald Goldman

        After a July 24, 2016 examination, in a response form, Donald Goldman, MD, opined Plaintiff: could occasionally lift and carry up to 15 pounds; could frequently lift and carry five to ten pounds; could stand and/or walk up to two hours per day and sit less than six hours a day; and, had a limited ability to push and pull. (R. 454.)

        More than two years later, in an October 25, 2018 letter, Dr. Goldman stated he saw Plaintiff seven times from 2015 to 2018. (R. 524.)   Throughout those examinations, Plaintiff's functional restrictions of motion and his clinical evaluation did not change by more than a few degrees. (R. 524-525.)   Dr. Goldman reported Plaintiff's prognosis, i.e., permanent orthopaedic impairments to the cervical spine, thoracic spine, and lumbar spine demonstrated by MRI and failure of improvement despite undergoing multiple surgical series of epidural steroids and trigger injections. (R. 527.)   Further, based upon objective findings, the medical evidence showed Plaintiff suffered a painful functional restriction of motion by more than 30 percent. (Id.)   Accordingly, the Doctor opined Plaintiff: was unable to drive more than 20 to 25 minutes due to ongoing neck pain, which pain also restricted his data entry ability; could not sit in a car or a chair for more

than 30 minutes due to severe low back pain; possessed a severely compromised ability to kneel, squat, bend, run, jump, stoop, or crawl due to herniations in his thoracic and lumbar spines, with Plaintiff's inability to bend, stoop, or twist also restricting his ability to lift and carry; and, had a restricted ability to push and pull because of his neck and back pain, which was based upon objective medical findings.  (R. 528.)  Thus, Dr. Goldman opined Plaintiff could not work in any type of employment and "[f]rom a classification point of view . . . , he would equal in combination 1.04 A&C".  (Id.)

C.   The VE's Testimony

At Plaintiff's disability hearing, the ALJ asked the VE to consider a series of hypotheticals. (R. 50.)  When asked to consider a hypothetical individual with a light exertional level, the VE testified he could perform Plaintiff's past work. (R. 60-61.)  When asked to consider a hypothetical individual with a sedentary exertion level, the VE testified Plaintiff's past work would be eliminated and there would not be any transferable skills to any sedentary jobs. (R. 61.)  With these limitations, the VE testified other available positions would include: information clerk; front desk receptionist; telephone solicitor; document preparer; and, order clerk. (R. 61-63).  When the ALJ added the further limitation that the individual could occasionally lift up to 15 pounds, stand or walk two hours per eight-hour workday, and

sit less than six hours per eight-hour workday, the VE testified such hypothetical person would be precluded from all employment (R. 63.)

DISCUSSION

I.  Standard of Review

In reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90–91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)). District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard or if the ALJ's ruling was not supported by substantial evidence. Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)). "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

II.  The ALJ's Decision

A.  The Five-Step Disability Analysis

First, the ALJ found Plaintiff meets the insured status requirements through December 31, 2021. (R. 13.)  The ALJ then

applied the five-step disability analysis and concluded Plaintiff was not disabled from February 10, 2014, the alleged onset date (hereafter, the "Onset Date"), through December 5, 2018, the decision date. (R. 11.)

At <u>step one</u>, the ALJ found Plaintiff had not engaged in substantial gainful activity since the Onset Date, and, although Plaintiff had worked after said Onset Date, such work was an unsuccessful work attempt. (R. 13.)

At <u>step two</u>, the ALJ found Plaintiff had severe impairments: lumbar spine degenerative disc disease; cervical spine degenerative disc disease; and migraine headaches. (<u>Id</u>.)

At <u>step three</u>, the ALJ determined Plaintiff's impairment did not meet or medically equal the severity of any impairments listed in Appendix 1 of the Social Security regulation. (R. 14.) In doing so, the ALJ considered Listing 1.04 for disorders of the spine resulting in compromise of a nerve root or the spinal cord with (A) evidence or nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; (B) spinal archnoiditis, confirmed by an operative note or pathology report of tissue biopsy or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or

posture more than once every two hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging manifested by chronic radicular pain and weakness, and resulting in inability to ambulate effectively. (Id.)  The ALJ found Plaintiff did not meet this listing because Plaintiff consistently presented with normal gait and his examinations did not show sensory loss. (R. 15.) Additionally, Plaintiff's muscle strength and tone were normal in all groups of upper and lower extremities with no atrophy. (Id.)

At step four, the ALJ determined Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b), except he can lift up to twenty pounds occasionally, lift or carry up to ten pounds frequently, stand and/or walk six hours and sit six hours per eight hour work day, occasionally climb ramps and stairs, and can only occasionally balance, stoop, kneel, crouch and crawl.  In addition, claimant should avoid hazards such as moving machinery and unprotected heights.

(Id.)  The ALJ determined that, while Plaintiff's impairments could reasonably be expected to cause his symptoms, his statements about the intensity, persistence, and limiting effects of the symptoms were not "entirely consistent" with the medical evidence and other evidence in the record. (R. 16.)  The ALJ then summarized Plaintiff's history with migraine headaches, including his brain MRI and medication usage. (Id.)  He continued, describing

Plaintiff's neck and back injury and summarizing Plaintiff's orthopedic visits at Dr. Chernoff's office. (Id.)  The ALJ noted Plaintiff received physical therapy, injections, and pain medication. (R. 17.)  He determined Plaintiff's statements of intensity, persistence, and limiting effects were inconsistent because, while Plaintiff alleged his daily living activities were extremely limited, Plaintiff also testified at his disability hearing that he did light shopping. (Id.)

The ALJ also considered the opinion of internal examiner Dr. Basnayake, to which he gave "great weight" because it was consistent with his own physical findings and the objective medical evidence from Plaintiff's treating physician. (R. 18-19.)  The ALJ highlighted Dr. Basnayake's observations of Plaintiff, e.g., his: normal gait; ability to heel- and toe-walk without difficulty; being able to change for the exam without assistance; getting on and off the examination table without help;, and being able to rise from a chair without difficulty. (R. 17.)  The Doctor also reported Plaintiff was unable to cook, clean, do laundry, or go shopping. (Id.)  Dr. Basnayake opined Plaintiff should avoid driving and operating machinery, and Plaintiff had mild to moderate limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, and kneeling due to his neck and back pain. (Id.)

Further, the ALJ considered the opinion of Dr. Goldman who, on July 24, 2016, opined Plaintiff: could lift up to 10 pounds frequently and 15 pounds occasionally; was able to stand or walk up to two hours per day; could sit no more than six hours per day; was limited in pushing and or pulling; and, could not crawl, climb or use ladders scaffolds or ramps. (R. 18.) Additionally, two-plus years later, on October 25, 2018, Dr. Goldman opined Plaintiff could not sit for more than thirty minutes nor work in any type of employment, and Plaintiff in combination equals listing 1.04 A & C. The ALJ gave Dr. Goldman's opinions "little weight" since his limitations about Plaintiff's ability to stand and walk were too restrictive and not supported by objective medical evidence, which demonstrated Plaintiff exhibited normal unassisted ambulation, normal strength, and normal sensory. (Id.) Additionally, Plaintiff had no evidence of motor loss, sensory loss or weakness, or an inability to ambulate effectively. (Id.) Rather, the ALJ based his RFC assessment upon Plaintiff's "conservative treatment," as well as the lack of objective medical evidence supporting disabling pain and extreme restrictions to Plaintiff's daily living. (Id.)

Finally, at step five, the ALJ determined Plaintiff could perform past relevant work as a detective with a light exertion level. (R. 18-19.) This determination was based, in part, upon the VE's testimony that Plaintiff's RFC "when compared to the

requirements of the above listed past job found that the [Plaintiff] was capable of performing his past job." (R. 19.) Thus, the ALJ determined Plaintiff was not disabled. (<u>Id.</u>)

III. <u>Analysis</u>

Plaintiff advances one argument on appeal: the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh treating orthopedist Dr. Goldman's opinion, and, instead relied upon examiner Dr. Basnayake's opinion. (Pl. Support Memo at 12.) Because Plaintiff filed his initial application for Social Security disability benefits before March 27, 2017, <u>i.e.,</u> on February 11, 2016, the "treating physician rule" applies. <u>See</u> <u>Poceous v. Comm'r of Soc. Sec.</u>, No. 20-CV-4870, 2024 WL 3029197, at *12 n.9 (E.D.N.Y June 17, 2024).

The "treating physician rule" states medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). The regulation states:

> Generally, we give more weight to medical opinions from your treating sources . . . . If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) <u>is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record</u>, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2) (emphasis supplied; second and third alterations in original). Thus, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted).

When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider: (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist. Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)); see also Estrella, 925 F.3d at 95. The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 287 (E.D.N.Y. 2008); see Estrella, 925 F.3d at 96. An ALJ provides "'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35

(2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless stated that [the physician's] opinion . . . was contradictory to the rest of the record evidence."). "Ultimately, an ALJ must comprehensively set forth her reasons for the weight assigned to a treating physician's opinion." Id. (internal quotation marks and citation omitted). "Good reasons" are reasons that assure the reviewing court that "the substance of the treating physician rule was not traversed." Estrella, 925 F.3d at 96.

An ALJ's failure to explicitly apply these factors when assigning weight to a treating physician's opinion is a procedural error; however, where "'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,'" the Court will affirm. Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32); see also Richards, 2024 WL 1673279, at *2. "If the Commissioner has not otherwise provided good reasons for its weight assessment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth its reasons." Id. (internal quotation marks and brackets omitted); see also Hart, 2023 WL 2873247, at *4 (stating failure to provide good reasons for not crediting the opinion of claimant's treating physician is grounds for remand).

Here, Plaintiff argues the ALJ erred in giving "little weight" to the opinions of Dr. Goldman, Plaintiff's treating

physician. (Pl. Support Memo at 13.)  Instead, the ALJ credited
consultative examiner Dr. Basnayake's opinion with "great weight."
(R. 18.)  Plaintiff elaborates, asserting the ALJ gave inadequate
reasons for rejecting the treating physician's opinion, and
instead relied upon a vague opinion. (Pl. Reply at 2.)  The Court
concurs.

The record shows the ALJ did not explicitly discuss the
Burgess factors in granting "little weight" to the opinion of Dr.
Goldman, Plaintiff's treating physician.  Rather, he simply
stated, without explanation or citation, Dr. Goldman's opinion was
assigned "little weight" because the objective record did not
support his statements. (R. 18.)  Moreover, "[e]ven if the ALJ had
provided a sufficient discussion of the evidence supporting and
contradicting" Dr. Goldman's opinions, the decision neither
addressed the "frequency, length, nature, and extent of treatment"
by Dr. Goldman, nor Dr. Goldman's "relevant expertise." Persaud
v. Comm'r of Soc. Sec., No. 22-2640, 2023 WL 7211823, at *2 (2d
Cir. Nov. 2, 2023) (directing remand of case to the Commissioner
where, in the absence of the ALJ discussing the Burgess factors,
it was unclear why the ALJ assigned "little weight" to the treating
physician's opinion).  Yet, the record evidences a regular treating
relationship between Plaintiff and Dr. Goldman since 2015, with
Dr. Goldman having seen Plaintiff seven times (R. 524), which is
in sharp contrast to the one-time medical consultative examination

of Plaintiff performed by Dr. Basnayake. (R. 443). Indeed, Dr. Goldman stated he saw Plaintiff on October 22, 2015; January 26, 2016; September 12, 2016; September 4, 2017; February 6, 2018; August 8, 2018; and October 2018. (R. 524.) Further, Dr. Goldman evaluated Plaintiff with a goniometer and a tape measure at each appointment. (R. 526.) In his October 2018 opinion, the Doctor stated the functional restrictions of motion and his clinical evaluation of Plaintiff never changed by more than a few degrees. (R. 524-525.) Given Dr. Goldman's lengthy doctor-patient relationship with Plaintiff, the Court cannot be sure the ALJ would have assigned Dr. Goldman's opinions "little weight" if he had explained his consideration of the Burgess factors, which he failed to do.

Furthermore, while Dr. Basnayake physically examined Plaintiff, his was a one-time consultative examination in July 2016. Therefore, his "opinions or report should be given limited weight." Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (quoting Cruz v. Sullivan, 912 F.2d 8, 18 (2d Cir. 1990)). "This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz, 912 F.2d at 13; see also Fintz v. Kijakazi,

No. 22-CV-0337, 2023 WL 2974132, at *4-5 (E.D.N.Y. Apr. 15, 2023)
(finding deficient ALJ's reliance on single report of consulting
physician who examined claimant once, especially since courts
frequently caution ALJs against such heavy reliance of same;
stating "the Second Circuit has warned that heavily relying on an
examiner who only examined a claimant once is inadvisable" (citing
Estella v. Berryhill, 925 F.3d 90, 98 (2d Cir. 2019).).  Of further
consequence is that, as is evident from the record, after Dr.
Basnayake's sole July 2016 examination, Dr. Goldman saw Plaintiff
five times.  (R. 524.)  Yet, the ALJ did little to reconcile the
differences between Dr. Basnayake's July 2016 opinion--based upon
one examination of Plaintiff--and Dr. Goldman's subsequent October
2018 opinion--based upon his extended patient-doctor relationship
with Plaintiff.   In sum, given the ALJ did not articulate his
consideration of the Burgess factors, "the Court is left with the
impression the ALJ cherrypicked the record to choose what supported
his RFC determination."  Poceous, 2024 WL 3029197, at *13 n.11;
see also Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y.
1991) (stating an ALJ cannot simply "pick and choose" evidence in
the record that supports his conclusion).  This is not acceptable;
rather, given the identified deficiencies in the ALJ's decision,
"the ALJ's heavy reliance on the [consulting] opinion [of Dr.
Basnayake] constitutes a legal error."  Fintz, 2023 WL 2974132, at

*6.  Such error warrants remand.  See Poceous, 2024 WL 3029197, at *15.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 11) is GRANTED, and the Commissioner's Cross-Motion (ECF No. 14) is DENIED.  This matter is REMANDED for proceedings consistent with this Memorandum and Order.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August 5, 2024
        Central Islip, New York